UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Court No. 7:24CV00273 |
| | ) |
| $94,752.52 IN U.S. CURRENCY | ) |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

The United States of America brings this Complaint for Forfeiture *In Rem* and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

NATURE OF THE ACTION

1. This is a civil action *in rem* brought to forfeit and condemn certain personal property assets to the use and benefit of the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), and 21 U.S.C. § 881(a)(6), for violations of 18 U.S.C. §§ 1957, 1343 and 21 U.S.C. § 841(a)(1).

THE DEFENDANTS *IN REM*

2. The defendant property consists of approximately $94,757.52 in U.S. currency seized from Jaimeka Mechelle Austin and Towanna Demetrice Austin on May 22, 2023, at Richard McIntyre & Associates PLLC, 8220 University Executive Park Drive, Suite 830, Charlotte, NC 28262-3380 and is presently in the custody of the United States Marshal's Service at the Federal Reserve Bank.

JURISDICTION AND VENUE

3. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345 and over an action for forfeiture under 28 U.S.C. § 1355(a).

4. This Court has *in rem* jurisdiction over the defendant property under 28 U.S.C. § 1355(b).

5. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1) because the acts giving rise to this forfeiture occurred in this district and pursuant to 28 U.S.C. § 1395 because the property is located in this district.

6. Upon the filing of this Complaint, the United States requests the Clerk of Court issue a Warrant of Arrest *in rem* pursuant to Supplemental Rule G(3)(b)(i), which the government will execute upon the property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

## BASIS FOR FORFEITURE

7. The defendant property is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), and 21 U.S.C. § 881(a)(6) as property that was involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957; and/or constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. §§ 1957, 1343, and/or 21 U.S.C. § 841(a)(1).

## FACTS

I. **Paycheck Protection Program**

8. On March 27, 2020, the President signed into law the Coronavirus Aid, Relief, and Economic Security (CARES) Act.

9. The CARES Act created the Paycheck Protection Program (PPP).

10. The PPP was a loan program created to incentivize small businesses to keep employees on payroll during the COVID-19 pandemic.

11. The PPP was administered through the Small Business Administration (SBA).

12. PPP loans could be obtained from lenders without collateral or personal guarantees.

13. PPP borrowers were not charged any fees by the government or lenders.

14. PPP lenders funded the loans with their own monies, but the loans were 100% guaranteed by the SBA.

15. PPP borrowers could apply for loan forgiveness.

16. Sole proprietors, independent contractors, and self-employed persons were among those eligible to apply for a PPP loan.

17. To be eligible for a PPP loan, an applicant entity must have been in business prior to February 15, 2020.

18. To obtain a PPP loan, an eligible person or entity was required to submit a PPP loan application signed by an authorized person or business representative.

19. The PPP loan application required disclosure of the applicant's average monthly payroll expenses and number of employees. This information determined the amount of money an applicant was eligible to receive.

20. The PPP loan application required the applicant to certify the following information:

   a. Whether the applicant or any individual owning 20 percent or more of the equity of the applicant was presently incarcerated or, for any felony, presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges had been brought in any jurisdiction; and

   b. Whether the applicant or any individual having an ownership interest has been convicted, pled guilty, pled nolo contendere, or commenced any form of parole or probation for any felony involving fraud, embezzlement, or a false statement in a loan application or application for federal assistance within the last five years, or any other felony within the last year.

21. If the PPP loan application indicated yes to any of the questions in Paragraph 19, the loan would be denied.

22. The PPP loan application also required the applicant to attest that the PPP loan funds would be utilized in accordance with the purposes identified on the application.

## II.     Austin's Fraudulent PPP Loan

23. According to Virginia State Corporation Commission (VSCC) records, Austin created Mechelle's Boutique LLC on or about September 13, 2019.

24. Austin was the sole owner and authorized representative of Mechelle's Boutique.

25. Austin failed to pay the required registration fee for Mechelle's Boutique LLC and the VSCC thus cancelled the company's LLC registration on December 31, 2020.

26. Mechelle's Boutique LLC purported to be a women's clothing store.

27. Austin never operated a business associated with the Mechelle's Boutique LLC.

28. Mechelle's Boutique never purchased any inventory.

29. Mechelle's Boutique never sold any clothing or any other goods.

30. Mechelle's Boutique never had any employees.

31. Mechelle's Boutique never paid regular payroll.

32. Mechelle's Boutique never had any retail space.

33. Mechelle's Boutique never engaged in any marketing.

34. Mechelle's Boutique never made any tax payments.

35. In March 2021, Austin sought a PPP loan from MBE Capital Partners (MBE) on behalf of Mechelle's Boutique.

36. Austin's March 2021 PPP loan application states Mechelle's Boutique had one employee and that the sole purpose of the loan was for payroll.

37. Austin's March 2021 PPP application was fraudulent because ….

38. On March 23, 2021, MBE disbursed a $26,195 PPP loan to Austin.

39. In May 2021, Austin sought a second PPP loan from MBE on behalf of Mechelle's Boutique.

40. Austin's May 2021 PPP loan application states Mechelle's Boutique had one employee and that the sole purpose of the loan was for payroll.

41. Austin's May 2021 PPP application was fraudulent because . . .

42. On May 25, 2021, MBE disbursed a $26,195 PPP loan to Austin.

43. On June 23, 2021, Austin filed an application for re-instatement of Mechelle's Boutique as an LLC with the VSCC.

44. Austin deposited the PPP loan money into her Wells Fargo personal account and Wells Fargo business account.

45. From her two Wells Fargo accounts, Austin never made any payroll payments.

46. From her two Wells Fargo accounts, Austin never made any other permissible business expenses as required by SBA's PPP guidelines.

47. Instead of paying permissible business expenses, Austin spent $8,150.22 of the PPP loan funds in purchases at Gucci.

48. Austin posted multiple photographs of herself wearing Gucci clothing items on Facebook shortly after the $8,150.22 in purchases from Gucci.

49. Instead of paying permissible business expenses, Austin spent $10,309.46 on a stay at the Fairmont El San Juan hotel, a high-end resort in Puerto Rico in May 2021.

### III.   Austin's PPP Fraud Scheme

50. Jaimeka Austin is also known is "Big Meech".

51. Austin shares a child with the leader of the Melrose street gang.

52. Austin assisted family members, Melrose street gang members, and other individuals in setting up limited liability companies (LLC), then fulfilling and submitting fraudulent PPP loan applications in exchange for a commission on each loan.

53. Beginning in the summer of 2020, Austin communicated with approximately 114 individuals via Facebook messenger offering to assist individuals in obtaining $9,000 in PPP loans in exchange for $2,000 of the PPP loan proceeds.

54. By February of 2021, Austin communicated with various individuals via Facebook messenger offering to assist individuals in obtaining $20,000 in PPP loans in exchange for $5,000 of the PPP loan proceeds.

55. For individuals utilizing Austin's services, they provided her their name, social security number, birth date, address, phone number, email, picture of their driver's license, bank account number and routing number, and a bank statement.

56. For individuals who did not have an LLC, Austin charged an additional fee to set up the LLC for the PPP loan.

57. With the provided information from individuals, Austin collaborated with two individuals: K.G. and A.H.

58. K.G. created approximately 75 fake Schedule Cs for businesses that all listed $115,360 in gross receipts and sales, $692 in operating expenses, $300 in home expenses, and $114,368 in total profit. The only information that was changed on these fake Schedule Cs was the business name and proprietor information, but the approximately 75 Schedule Cs otherwise were identical.

59. Austin and her collaborators used the fake Schedule Cs to submit fraudulent PPP loan applications.

60. A.H. prepared PPP loan applications for approximately 55 individuals identified by Austin. These individuals did not have eligible businesses to obtain PPP loans, but A.H. nonetheless submitted the fraudulent applications.

61. Austin paid A.H. for her assistance in preparing the PPP loans.

62. Austin received a commission of $1,000 to $10,000 on each fraudulently obtained PPP loan.

63. Austin deposited her commissions from the fraudulently obtained PPP loans into her personal and business Wells Fargo bank accounts.

## IV. Austin's Use of the Fraudulently Obtained PPP Funds

64. Austin used her commission from the fraudulent PPP loans to purchase designer clothing.

65. Austin used her commission from the fraudulent PPP loans to seek plastic surgery, including but not limited to, butt lifts, liposuction, and breast implants.

66. Austin used her commission from the fraudulent PPP loans for the downpayment on a house in Charlotte, North Carolina.

67. On March 23, 2021, the first fraudulently obtained PPP loan was deposited into Austin's Wells Fargo accounts in the amount of $26,195.

68. Prior to the March 23, 2021 deposit, Austin only had a total of $768.93 in her Wells Fargo accounts.

69. Effective April 6, 2021, Austin entered into an exclusive buyer agreement with Engel & Volkers Uptown Charlotte for the purchase of 6428 Ellimar Field Lane, Charlotte, North Carolina.

70. On May 24, 2021, the second fraudulently obtained PPP loan was deposited into Austin's Wells Fargo accounts in the amount of $26,195.

71. Between March and May 2021, the only deposits into Austin's Wells Fargo accounts were the fraudulently obtained PPP loans.

72. On May 27, 2021, Austin received a pre-approval letter for a mortgage from New American Funding.

73. Also on May 27, 2021, Austin entered into a home purchase agreement for 6428 Ellimar Field Lane, Charlotte, North Carolina, with a sales price of $338,140.

74. As part of the home purchase agreement, on May 27, 2021, Austin made an earnest deposit of $4,000 for the purchase of 6428 Ellimar Field Lane from her Wells Fargo accounts.

75. On June 1, 2021, Austin went under contract to purchase 6428 Ellimar Field Lane.

76. On June 22, 2021, Austin asked K.G. via text message to sign a letter stating K.G. gifted Austin $20,000. K.G. agreed to sign the letter.

77. On June 22, 2021, Austin told K.G. via text message that Austin would give K.G. $20,000 to transfer back to Austin for the purpose of making it look like K.G. gifted Austin the $20,000. K.G. did not follow through with this plan.

78. On August 31, 2021, Austin's Wells Fargo accounts had a total balance of $100,001.97, which included the fraudulently obtained PPP loan money and Austin's commissions for assisting others in obtaining fraudulent PPP loan money.

79. Austin closed on her purchase of 6428 Ellimar Field Lane on October 6, 2021.

80. To complete the purchase of 6428 Ellimar Field Lane, Austin made a $70,000 down payment, which was wired by N.D. from Wells Fargo accounts.

81. Closing documentation shows Austin claimed the $70,000 downpayment was a gift from N.D., who Austin asserted was her godmother.

82. On May 26, 2022, Jaimeka Austin filed a quitclaim deed with Mecklenburg County, North Carolina, granted 6428 Ellimar Field Lane to herself and her mother, Towanna Austin, as joint tenants with rights of survivorship.

83. Between October 2021 and May 2022, Austin's mortgage records show she made her monthly payments to the mortgage company from her Wells Fargo accounts.

### V. Austin's Marijuana Distribution

84. On May 9, 2023, the FBI executed a search warrant at 1717 Jersey Avenue, Roanoke Virginia.

85. Austin resides at 1717 Jersey Avenue, Roanoke, Virginia.

86. During the execution of the search warrant, agents observed and seized approximately four pounds of a green, leafy substance, which laboratory testing later confirmed was marijuana.

87. During the execution of the search warrant, Austin admitted to FBI agents that she sells marijuana.

88. Austin has no legitimate source of income.

89. Austin's income from 2021 to 2023 was solely derived from her fraudulently obtained PPP loans, her PPP fraud scheme, and marijuana sales.

### VI. Austin's Sale of 6428 Ellimar Field Lane

90. Austin listed 6428 Ellimar Field Lane for sale in April 2023.

91. On or about April 20, 2023, 6428 Ellimar Field Lane went under contract for sale.

92. On May 22, 2023, the sale of 6428 Ellimar Field Lane closed for which Austin and her mother, Towanna Austin, were the sellers.

93. According to the closing statement, Austin and her mother were to each receive $47,376.26 in proceeds from the sale of 6428 Ellimar Field Lane.

94. On May 17, 2023, U.S. District Judge Robert S. Ballou signed a Warrant to Seize Property Subject to Forfeiture for Austin and her mother's proceeds from the sale of 6428 Ellimar Field Lane ("Forfeiture Seizure Warrant").

95. On May 22, 2023, FBI Special Agent Richard Miller served the Forfeiture Seizure Warrant on Richard McIntyre and Associates, PLLC.

96. On May 23, 2023, Richard McIntyre and Associates, PLLC sent two checks in the amounts of $47,376.26 to the FBI pursuant to the Forfeiture Seizure Warrant.

97. Those two checks, totaling $94,752.52, are the Defendant Property.

98. The Defendant Property is property involved in money laundering in violation of 18 U.S.C. § 1957.

99. The Defendant Property is property derived from proceeds traceable to wire fraud in violation of 18 U.S.C. § 1343. Specifically, the Defendant Property is property traceable to Austin's PPP fraud.

100. The Defendant Property is property derived from proceeds traceable to illegal drug distribution in violation of 21 U.S.C. § 841(a)(1).

101. These and additional facts supporting this Complaint are stated in the attached Declaration of FBI Special Agent Richard A. Miller and are incorporated by reference herein.

WHEREFORE, the United States of America respectfully requests that the Clerk of Court issue a Warrant of Arrest *in rem* pursuant to Supplemental Rule G(3)(b); that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant property to be condemned and forfeited to the United States for

disposition according to law; and that the United States be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

                CHRISTOPHER R. KAVANAUGH
                United States Attorney

                <u>/s/ Krista Consiglio Frith</u>
                Krista Consiglio Frith
                Assistant United States Attorney
                Virginia State Bar No. 89088
                P. O. Box 1709
                Roanoke, VA  24008-1709
                Telephone: (540) 857-2250
                Facsimile: (540) 857-2283
                E-mail:  Krista.frith@usdoj.gov

## VERIFICATION

I am a Richard A. Miller, Special Agent of the Federal Bureau of Investigation, and one of the agents assigned the responsibility for the above-captioned matter. I have read the contents of the foregoing Complaint for Forfeiture, and the statements contained therein are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 22nd day of April, 2024.

_____
Richard A. Miller
Special Agent, Federal Bureau of Investigation