| | | |
|---|---|---|
| STATE OF VIRGINIA | ) | |
| | ) | ss. **AFFIDAVIT OF RICHARD A. MILLER** |
| CITY OF ROANOKE | ) | |

I, Richard A. Miller, being duly sworn, do hereby depose and state as follows:

## BACKGROUND OF AFFIANT

1.      I am a Special Agent ("SA") with the Federal Bureau of Investigation (FBI) and have been employed with the FBI since November 2003. I received initial training and instruction to become an SA at the FBI Academy located in Quantico, Virginia, which included training concerning violations of the United States criminal statutes. I am currently assigned to the Richmond Division of the FBI, Roanoke Resident Agency. I am presently, and have been previously, assigned to investigate a variety of criminal and national security matters, to include violent crimes, gangs, crimes against children, international terrorism, domestic terrorism, economic crimes, and counter-intelligence investigations. Further, I have experience and training in a variety of investigative and legal matters, including the topics of lawful arrests, the drafting of search warrant affidavits, and probable cause.

## PURPOSE OF APPLICATION

2.      This affidavit is being submitted in support of a Complaint for forfeiture *in rem* against $94,750.52 in sale proceeds from the sale of 6428 Ellimar Field Lane, Charlotte, North Carolina, 28215 (the "SALE PROCEEDS").

3.      There is probable cause to believe the SALE PROCEEDS are subject to civil forfeiture for three separate reasons. First, I submit that the SALE PROCEEDS were involved in or are traceable to property involved in money laundering offenses in violation of 18 U.S.C. § 1957. Second, the SALE PROCEEDS are property, real or personal, that constitutes or is derived

**Affidavit of Special Agent Richard A. Miller**                    **Page 1**

from proceeds traceable to the gross receipts obtained, directly or indirectly, from violations of 18 U.S.C. § 1343. Third, the SALE PROCEEDS are property that constitutes or is derived from proceeds obtained, directly or indirectly, as to violations of 21 U.S.C. § 841(a)(1). The SALE PROCEEDS are therefore subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), and 21 U.S.C. § 881(a)(6).

4.     Title 18 U.S.C. § 1957(a) makes it a crime to knowingly engage or attempt to engage in a "monetary transaction" in "criminally derived property of a value greater than $10,000 and [that] is derived from specified unlawful activity" (SUA).

5.     The purpose of "money laundering" as defined by 18 U.S.C. § 1957 is to disguise the illicit nature of funds by introducing them into legitimate commerce and finance thereby making them "clean." This financial process is most commonly conducted using three steps referred to as "placement," "layering," and "integration." Typically, the "placement" phase of this financial process takes place when proceeds from illicit sources are placed in a financial institution or business entity. "Layering" takes place when these funds are then used in seemingly legitimate commerce transactions which makes the tracing of these monies more difficult and removed from the criminal activity from which they originated. Finally, the "integration" phase is when these funds are then used to promote the unlawful activity or for the personal benefit of the money launderers and others.

6.     Any property "involved in" a money laundering transaction, or any property traceable to such property involved in a money laundering transaction is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

**Affidavit of Special Agent Richard A. Miller**                    **Page 2**

7.      I also have probable cause to believe that this property is subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) because the property constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1343 or a conspiracy to commit such offense.

8.      Any property, real or personal, which constitutes proceeds or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343 or a conspiracy to commit such is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

9.      I also have probable cause to believe that this property is subject to civil forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because the property constitutes or is derived from proceeds obtained, directly or indirectly, as to violations of 21 U.S.C. § 841(a)(1).

10.     Any property, real or personal, which constitutes proceeds or is derived from proceeds traceable to a violation of 21 U.S.C. § 841(a)(1) is subject to civil forfeiture pursuant to 21 U.S.C. § 881(a)(6).

11.     Under 18 U.S.C. § 984, for any forfeiture action in rem in which the subject property consists of cash, monetary instruments in bearer form, or funds deposited in an account in a financial institution:

    a.      The government need not identify the specific funds involved in the offense that serves as the basis for the forfeiture.

    b.      It is not a defense that those funds have been removed and replaced by other funds; and

    c.      Identical funds found in the same account as those involved in the offense serving as the basis for the forfeiture are subject to forfeiture.

**Affidavit of Special Agent Richard A. Miller**                                    **Page 3**

12.     In essence, 18 U.S.C. § 984 allows the government to seize for forfeiture identical property found in the same place where the "guilty" property had been kept. The statute does not, however, allow the government to reach back in time for an unlimited period. A forfeiture action (including a seizure) against property not directly traceable to the offense that is the basis for the forfeiture cannot be commenced more than one year from the date of the offense.

13.     The information set forth in this affidavit consists of information I have gathered and observed firsthand through the course of this investigation to date, as well as information relayed to me by other law enforcement personnel, information from victim statements, interviews of witnesses, non-law enforcement personnel, and by review and analysis of various financial records. The information in this affidavit is not intended to detail each and every fact and circumstance of the investigation or all information known to me or all the participants involved in the investigation. Rather, this affidavit serves solely to establish that probable cause exists in support of a Complaint for forfeiture *in rem* against the SALE PROCEEDS; therefore, I have not included every detail that I have learned over the course of the investigation.

## **BACKGROUND ON THE PAYCHECK PROTECTION PROGRAM**

14.     On or about March 27, 2020, the President signed into law the Coronavirus Aid, Relief, and Economic Security ("CARES") Act in response to the COVID-19 pandemic. Among the programs included in the CARES Act was the Paycheck Protection Program ("PPP"). The PPP was a loan program created to incentivize small businesses to keep employees on payroll during COVID-19. Per the Small Business Administration ("SBA"), PPP loans existed to assist small businesses in funding payroll costs, mortgage interest, rent, utilities, worker protection costs related to COVID-19, uninsured property damage costs caused by looting or vandalism during

**Affidavit of Special Agent Richard A. Miller**                    **Page 4**

2020, and certain supplier costs and expenses for operations. PPP loans could be obtained without collateral or personal guarantees. PPP borrowers were not charged any fees by the government or lenders. If a borrower did not apply for loan forgiveness, payments were deferred until 10 months after the end of the covered period for the borrower's loan forgiveness (between 8 and 24 weeks).

15.    Per SBA, those eligible to apply for a PPP loan included sole proprietors, independent contractors, and self-employed persons. Additionally, as a condition of application, the business at issue must have been in operation prior to February 15, 2020.

16.    To obtain a PPP loan, an eligible person or entity was required to submit a PPP loan application signed by an authorized person or business representative. The applicant was required to state, among other things, its average monthly payroll expenses and its number of employees. These numbers were used to calculate the amount of money the applicant was eligible to receive under the PPP. In the application, the authorized representative was also required to make certain affirmative certifications regarding eligibility. Among other things, borrowers were required to attest to the following:

  a.    Whether the applicant (if an individual) or any individual owning 20 percent or more of the equity of the applicant was presently incarcerated or, for any felony, presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges had been brought in any jurisdiction; or

  b.    Whether the applicant (if an individual) or any owner of the applicant had 1) been convicted; 2) pleaded guilty; 3) pleaded nolo contendere; or 4) commenced any form of parole or probation (including probation before judgment) for any felony involving fraud, bribery, embezzlement, or a false statement in a loan application or application for

federal financial assistance within the last 5 years, or for any other felony within the last year.

If a borrower answered "yes" to any of the above questions, the loan was not supposed to be approved.

17.     There were additional questions a borrower was required to attest to that would not bar the loan from being approved. Borrowers were also required to attest that the PPP funds would be utilized as authorized by the PPP program.

18.     SBA provided two application periods in which the applying entity could apply for and receive two PPP loans. The PPP borrower application was revised several times to relax specific requirements set forth in the initial borrower application.[1]

19.     PPP loan applications were processed by a participating lender, such as a financial institution. If a loan was approved, the lender would fund the loan with its own monies. The loans were, however, 100% guaranteed by the SBA, an executive branch agency of the United States Government. Pursuant to the PPP, the interest and principal on the PPP loan could be forgiven if certain conditions were met, including that the proceeds were spent on certain permissible expenses, a certain percentage of the proceeds were used for payroll expenses, and the proceeds were spent within a designated period.

## SUMMARY OF THE INVESTIGATION

### *Fraudulent PPP Scheme*

20.     On May 12, 2021, FBI SAs Joshua Bills and Megan Effing and Task Force Officer ("TFO") Fatima Foster met with a complainant, hereinafter referred to as Confidential Witness #1

---

[1] These changes in requirements do not affect the criminality of the actions set forth in this affidavit.

**Affidavit of Special Agent Richard A. Miller**                    **Page 6**

("CW1"). CW1 is a loss prevention officer who works for an international company and has direct and indirect knowledge of criminal organizations and individuals in Northwest Roanoke. CW1 also has firsthand knowledge of many individuals from Northwest Roanoke who have engaged in acts of fraud and theft against CW1's employer. Further, CW1 has a lengthy history of working with law enforcement and has no criminal history that would call into question his/her credibility. For these reasons, the FBI deems CW1 to be a credible witness.

21.    In the course of at least five interviews between May 2021 and April 2021 conducted by SA Bills, SA Charles Jarboe, and TFO Adam Grubb, CW1 reported that "Big Meech," who CW1 identified as Jaimeka Austin, had been heavily involved in obtaining fraudulent PPP loans for numerous individuals in Northwest Roanoke, including members of the Melrose street gang, which is also known to the FBI as the "Quanie Gang." CW1 reported that Austin was the "baby mama" of gang leader S.W. CW1 learned this information from numerous people who had firsthand knowledge of Austin and S.W. and of their criminal activities. CW1 explained that the reporting individuals told this information to him/her and provided him/her with numerous photographs and Facebook messages relating to Austin and her PPP fraud activities in order to facilitate the initiation of an investigation by law enforcement.

22.    CW1 explained that Austin had learned how to file for fraudulent PPP loans from someone she had previously been incarcerated with. She then used this knowledge to get others to obtain fraudulent PPP loans and assisted them in doing so. According to CW1, to provide this assistance, Austin required these individuals (the "fraudulent loan applicants") to pay her a couple hundred dollars per person to set up a limited liability company ("LLC"). Then, Austin would meet with the fraudulent loan applicants and would use these individuals' phones to set up the PPP

**Affidavit of Special Agent Richard A. Miller**                    **Page 7**

loans. After the fraudulent loan applicants received their fraudulent loans, Austin would take a commission of $5,000-$10,000 in cash for each fraudulent loan. CW1 has reported that Austin's friends assisted Austin with perpetrating this scheme. CW1 also reported that several of Austin's family members received fraudulent PPP loans with Austin's assistance.

23.    CW1 stated that Austin had recently traveled out of the country to have a veneer put on her teeth and that she planned to have plastic surgery on her buttocks with the fraudulently-obtained money. The FBI's review of Austin's financial records shows a $500 payment to a plastic surgery center in Florida specializing in butt lifts, liposuction, and breast implants on or about July 9, 2021. CW1 provided the FBI with a photograph of Austin posing with large stacks of cash as well as with photographs of Austin and S.W. posing together and wearing what appears to be designer clothing. In one of the photographs, S.W. can be seen holding a stack of cash. CW1 provided copies of these photographs to the FBI along with Facebook posts from Austin's previous Facebook account, "Griselda Blanco." An initial review of the Facebook page by the FBI revealed a Facebook profile photograph of Austin and multiple photographs of Austin with her close associates.

24.    CW1 also stated that Austin had used the money that she had received from the PPP fraud to purchase a newly-constructed house in Charlotte, North Carolina, and that Austin was planning to move there soon, as of June 2021. According to CW1, Austin had put a lot of money down on the house-. The closing documents from the purchase of 6428 Ellimar Field Lane, Charlotte, NC, show Austin indeed gave a $77,600 down payment for the purchase of the house.

25.    Based on subject interviews, financial analyses, an analysis of Austin's Facebook Messenger chats, and text messages obtained from Austin's iCloud, Austin solicited members of

the Roanoke community to secure PPP loans for fictitious businesses. In some cases, she would reach out to the individual directly, and in others she was contacted by someone after the person heard about the scheme from someone else in the community. Austin would generally offer to secure an approximately $20,000 loan (which she sometimes noted could be forgiven) in return for paying her a $5,000 fee. She also offered to set up the business by creating an LLC and securing a Taxpayer Identification number ("TIN") for an additional $250. Once the person agreed, Austin would request that that person provide her with their personal identifying information ("PII"), business name, business activity, email address, and banking information. Once Austin received this information, she or one of her co-conspirators (K.G.) would create the LLC and secure the TIN. Whenever K.G. would create an LLC and secure a TIN, she would text the information to Austin. To create the LLCs, Austin or K.G. would provide the Virginia State Corporation Commission ("VSCC") with the requisite information for the various borrowers. Neither Austin nor K.G. was listed as members of the LLCs they created.

26.     After obtaining the requisite information, Austin would text this information to another co-conspirator, A.H.  A.H. would then fabricate a 2019 IRS Schedule C (Form 1040), Profit or Loss from Business (Sole Proprietorship) ("Schedule C"),[2] usually showing a Net Profit of around $100,000, which is the amount that would maximize the amount of the loan being requested without having to take any additional steps. A.H. would then submit a fabricated PPP loan application to a participating lender and would alert Austin once she had successfully done so. The lender would email a loan package to the prospective borrower who would digitally sign the documents and return them to the lender. Once the loan was approved, the loan would be

---

[2] A Schedule C is attached to a U.S. Individual Income Tax Return, Form 1040, and is used to report income or loss from a business that the taxpayer operated as a sole proprietor.

**Affidavit of Special Agent Richard A. Miller**                                        **Page 9**

disbursed to the borrower's account. Typically, the borrowers would then pay Austin her fee and spend the remainder of the proceeds on various personal expenses, such as trips, jewelry, and cash withdrawals. In many cases, the borrowers received a second draw of approximately $20,000, which was also spent on personal expenses.

*PPP Loans to Mechelle's Boutique*

27.     According to VSCC records, Austin created an LLC, Mechelle's Boutique LLC ("Mechelle's Boutique"), on or about September 13, 2019. Based on the VSCC records, as well as records obtained from Wells Fargo and the SBA, Austin is the sole owner and authorized representative of Mechelle's Boutique. The company purports to be a women's clothing store styled as a "Plus Size Boutique," but never operated as a business or sold any clothing. Although Mechelle's Boutique was originally in existence prior to February 15, 2020, as required by PPP guidelines, VSCC actually cancelled the company's registration on December 31, 2020, prior to Austin's application for PPP loan money for Mechelle's Boutique. The VSCC website attributes this cancellation to Austin's failure to pay the required registration fee. Austin filed an application for re-instatement of Mechelle's Boutique as an LLC on or about June 23, 2021, which VSCC granted.

28.     FBI analysis revealed that between March 2021 and May 2021, Austin received two PPP loans from lender MBE Capital Partners ("MBE"), each in the amount of $26,195. Both loans were taken out in the name of Mechelle's Boutique, and the funds were deposited into Austin's personal Wells Fargo checking account. The first loan was directly deposited into her Wells Fargo account on March 23, 2021, and the second loan was directly deposited into her Wells Fargo account on May 25, 2021.

**Affidavit of Special Agent Richard A. Miller**                              **Page 10**

29.     Records obtained from MBE show that in each application, Austin stated that Mechelle's Boutique had one employee and that the sole purpose of the loans was for payroll. Austin stated in her second draw application that Mechelle's Boutique had been established on February 16, 2018, though Austin did not provide a date of establishment in her first draw application. Records from MBE also show that Austin provided a fabricated Schedule C, reflecting that Mechelle's Boutique had $125,738 in receipts and $737 in expenses. These numbers appear fictitious because the information on this Schedule C is not consistent with the Schedule C that Mechelle's Boutique submitted to the IRS or the information that Austin submitted to Wells Fargo to open up a bank account for Mechelle's Boutique. In her second draw application, Austin stated that gross receipts for Mechelle's Boutique were $25,330 and $27,619 in the third and fourth quarters of 2020, respectively.

30.     On May 24, 2021, the day prior to the second PPP disbursement, Austin first set up her only known business account for Mechelle's Boutique LLC, a Wells Fargo business checking account. On the application for the account, Austin stated that she had one employee. And although Austin had sought $26,195 from each of her PPP loans and reported $52,949 in sales during the second half of 2020, she reported to Wells Fargo on the forms to open the business bank account that the annual gross sales for Mechelle's Boutique were only $3,300. On May 24, 2021, Austin transferred $10,000 from her personal account to her new business checking account.

31.     On or about August 27, 2021, an FBI forensic accountant reviewed Wells Fargo bank account statements, deposit records, checks, signature cards, and wire transfers for Austin's financial accounts from approximately September 2019 to November 2021. The analysis revealed an unusual number of inter-account transfers, which, based on my training and experience, appear

**Affidavit of Special Agent Richard A. Miller**                                    **Page 11**

consistent with efforts to layer and conceal financial activities. Notably absent from Austin's accounts during 2020 and 2021 were any transactions indicating operations for an active retail clothing business, such as purchase of inventory, regular payroll, or tax payments.[3] Additionally, the $500 that Austin wired to a plastic surgeon in Florida on July 9, 2021, came from her business account.

32.     The FBI forensic accountant's review of bank records from Austin's Wells Fargo business account, in which the PPP loan proceeds were deposited, indicated Austin has spent a large sum of money and has principally made purchases that appear to be for personal consumption rather than using the funds for payroll or other permissible expenses as required by PPP guidelines. For example, following the disbursement of PPP funds Austin made numerous large dollar retail purchases totaling approximately $30,948. This includes purchases at numerous retailers, including but not limited to the following: $8,150.22 in purchases at Gucci; $3,112.15 in purchases from Amazon; and $1,274.13 in purchases at Burberry. At least some of these items appear to be for Austin's personal consumption, as indicated by multiple photos on Facebook of her wearing the Gucci clothing items that she purchased. In addition, Austin spent approximately $23,782 on travel expenses, including a $10,309.46 stay at the Fairmont El San Juan Hotel, a high-end resort in Puerto Rico, from on or about May 9 through May 21, 2021.

33.     A review of Austin's emails also revealed a history of expensive retail purchases beginning shortly after Austin started her fraudulent PPP scheme in the summer of 2020 and continuing at a consistent rate until the fall of 2021 when Austin ran out of liquid funds.

---

[3] A significant volume of Austin's transactions involve electronic funds transferred to unknown third parties via a mobile payment service, Cash App, as well as cash deposits and withdrawals. As is further explained below, the investigation has revealed that Austin used Cash App to disburse and receive payments as a part of her fraudulent PPP scheme.

**Affidavit of Special Agent Richard A. Miller**                                      **Page 12**

a.       Austin's iCloud account contained a large amount of e-receipts from purchases made from a Green Dot (Apple Cash) account beginning in July 2020 showing that she purchased clothing and housewares from multiple retailers, including, but not limited to, Neiman Marcus, Gucci, Walmart, Burberry, Amazon, and Wayfair. The receipts tapered off in October and November 2021 and were replaced by purchase rejection emails (due to a lack of funds) and bank overdraft notices.

b.       A review of Austin's emails and voicemails identified a series of collections communications from Aaron's, a retailer from whom Austin had purchased and defaulted on multiple pieces of furniture.

34.       On February 5, 2022, Austin purchased a white 2019 Dodge Ram 3500 for $67,057. She paid $20,059 in cash. Because Austin typically received her fees for preparing PPP loan documents in cash and because Austin has no known source of legitimate income, it is believed that this cash is from illegal sources, primarily from Austin's loan document preparation fees.

*Evidence of Fraudulent PPP Scheme on Austin's Facebook Account*

35.       A review of public posts and images of a profile page for Facebook User "Griselda Blanco" with Facebook User ID 100038719000868 revealed multiple photographs of Austin and was clearly being used as one of her Facebook pages. Those posts and images included:

a.       Photographs of adult men wearing white T-shirts with "*Them 9-5 Boys Inside*" on the front and "*Them PPP Boys Outside*" on the back.

b.       A public post by Austin dated April 24, 2021, which read: *I'm so sick of everybody talking about a damn PPP LOAN!! Why tf does it matter to yaw so much who*

**Affidavit of Special Agent Richard A. Miller**                                        **Page 13**

*did or didn't do the ppp loan?? Yaw so bothered over some damn lunch money, cause that's all it is…*

    c.      A public post by another Facebook user to Austin dated April 24, 2021, which read: *Y'all want the 40k ppp?*

    d.      A public post by Austin dated April 25, 2021, with a photograph of several well-dressed women, which read: *We come from the church of the PPP, coming to collect our offering*

    e.      A public post by Austin dated May 3, 2021, which read: *& the next person who make a status talking about PPP, I'm earsing you. It's the pandemic ppl[4] out here really need help & yaw hating! They giving out money all types of ways all over the world for the littlest shit Who gives asf if you gotta pay it back & they cant put everybody in jail! Yaw bitches sell yaw food stamps what's the difference you know you can go to jail for that & yaw file taxes & never worked the list goes on! But I'm not gone be the one to judge I'm here for it all whatever you do keep them receipts*

36.     On or about September 7, 2021, the FBI obtained a federal search and seizure warrant in the Western District of Virginia for the contents of Austin's Facebook account. A review and analysis of Austin's Facebook account revealed prolific communications with numerous individuals regarding PPP fraud using Facebook Messenger. In many of these instances, Austin discussed sending and/or receiving pertinent information via cell phone and/or email. For instance, on March 16, 2021, Austin had the following conversation with one individual (hereinafter referred to as Subject 2):

---

[4] According to my training and experience, "ppl" is an abbreviation for "people."

**Affidavit of Special Agent Richard A. Miller**                                        **Page 14**

a.      Austin: *I know you wanna get some free bandszz*

b.      Subject 2: *Yep*

c.      Austin: *Yo got yo own business?*

d.      Subject 2: *Something like that do my name have to be on Any paperwork*

e.      Austin: *Yap. it's the ppp loan. I can get you 20 you gotta pay me 5 tho when you get it.*

f.      Subject 2: *20,000 give you back 5000*

g.      Austin: *Yap*

h.      Subject 2: *Fuck that I'm in so what I do*

i.      Austin then sent a screenshot apparently taken from the notes section of her cell phone with the information she needed to set up the fraudulent PPP loans. The screenshot read: *name, ssn, birthday, address, phone number, email, driver's license (pic of front and back), bank account and routing number on a voided check*

j.      Austin: *You gone need all this. LLC & EIN NUMBER ASAP*

k.      Subject 2: *I'm just iffy about my Social Security number did you do it*

l.      Austin: *Me & The whole gang. An you can text it to my phone you don't gotta send it here*

m.      Austin then sent a screenshot apparently taken from the notes section of her cell phone. The screenshot read: "*Done*" along with a document image which read: "*document(s) [3/15/2021 1:24:41 PM] MBE Capital Partners, 2: Hello, You have qualified for the highest loan amount available to you ($24,544.58) and it is now pre-approved.*"

**Affidavit of Special Agent Richard A. Miller**                    **Page 15**

n.      Austin: *SoMe times it's a lil more*

o.      Subject 2: *I'm scared that's the IRS*

p.      Austin: *Alrighty just trying before it ends. You can write a forgiven letter so you want have to pay it back*

q.      Subject 2: *Well help me then fr[5]*

r.      Austin: *What you wanna do*

s.      Subject 2: *Mannn fuck it wya[6]*

t.      After attempting multiple Facebook Messenger calls, Subject 2 wrote: *Mannnn dude I'm trying to come ov now and do this shit just hml[7]*

u.      Austin: *My bad I was on the phone & im at the gym you got cash app. I can go ahead and do yo LLC An get you stared*

v.      Subject 2: *Call me when you leave the gym*

w.      Austin: *Ok*

x.      Subject 2: *Fr dude. I got one more person that want to do it*

y.      Austin: *Text me 5408191306*

37.      Subscriber information received from U.S. Cellular revealed that the contact name for the account associated with phone number 540-819-1306 was Jaimeka Austin and that the associated phone was iPhone. The email address associated with this account, jmaria2016@icloud.com, was also found to be associated with Austin's Facebook account.

---

[5] According to my training and experience, "fr" is an abbreviation for "for real."
[6] According to my training and experience, "wya" is an abbreviation for "where you at."
[7] According to my training and experience, "hml" is an abbreviation for "hate my life."

**Affidavit of Special Agent Richard A. Miller**           **Page 16**

38.     Further review of the Facebook Messenger communications and images has revealed the following:

a.      Beginning in the summer of 2020, Austin communicated with approximately 114 individuals regarding PPP fraud. Austin offered to assist the individuals with obtaining a PPP loan for $9,000 but required a payment of $2,000 for her services.

b.      On June 6, 2020, Austin communicated with an associate using Facebook Messenger. Austin sent a link to a news article entitled, "*Feds arrest 2 men in first fraud case involving PPP loan program for small businesses hurt by coronavirus.*" After briefly discussing the article, Austin's associate wrote: "*Bitch not coming for 9000 person them people did millions.*"

c.      By February of 2021, Austin had begun to assist multiple other individuals with obtaining fraudulent PPP loans. By this time, Austin was telling those who reached out to her via Facebook Messenger that she could obtain loans for $20,000 instead of just $9,000. In order to obtain such a loan, however, Austin now required a payment of $5,000 for her services. In various posts, Austin indicated that the payments would be made 2-3 weeks after filing. By April of 2021, Austin also offered to set up LLCs for individuals interested in filing for PPP loans. Austin charged an additional $250 to set up an LLC.

d.      As early as February of 2021, Austin began circulating a screenshot taken from the notes section of her cell phone with the information she needed to set up the fraudulent PPP loans. The screenshot read: *name, ssn, birthday, address, phone number, email, driver's license (pic of front and back), bank account and routing number on a voided check*

**Affidavit of Special Agent Richard A. Miller**                                **Page 17**

    e.    By April of 2021, Austin had amended the screenshot to read:

        i.    *name, ssn, birthday, address, phone number, email, driver's license (pic of front and back), bank account number and routing number an a Bank statement 2020 feb*

        ii.    *An if you don't have a business it's 250*

        iii.    *You get 20 you pay out 5*

    f.    I understand this last statement to mean that, in order to receive a $20,000 loan, individuals needed to pay Austin a $5,000 commission.

    g.    The FBI also learned from Austin's Facebook account that, between June of 2020 and May of 2021, Austin communicated via Facebook Messenger with more than 40 individuals about filing for PPP loans and/or setting up LLCs. Many of the conversations are incomplete, indicating that they began and/or concluded via another medium. On several occasions, Austin and her associates discussed sending or receiving information via phone or email.

*Austin's iCloud Account*

39.    On March 18, 2021, Austin signed a DocuSign document for MBE for a promissory note for her first PPP loan for Mechelle's Boutique using her email account, jmaria2016@icloud.com.

40.    A review of Apple iCloud records for jmaria2016@icloud.com showed that between June 23, 2020, and July 23, 2021, Austin collaborated with multiple individuals to identify potential applicants for fraudulent PPP loans and to create applications for them. Chief among these collaborators were K.G. and A.H., both of whom assisted Austin with creating and filing

**Affidavit of Special Agent Richard A. Miller**           **Page 18**

fraudulent PPP applications. A.H. is a tax preparer and prepared taxes for various clients, including Austin. Because of her tax preparer job, A.H. was also familiar with tax returns and related documents. K.G. did not have a financial background but, when she was interviewed, she reported learning about PPP loan opportunities from various sources, including on the internet. K.G. learned from Facebook and others that Austin was someone who could help people get PPP loans.

41.     Between November 16, 2020, and July 23, 2021, Austin collected via text messages PII from at least 143 prospective PPP applicants to facilitate fraudulent loan applications. Austin and her associates used this PII to create additional documentation required to submit a PPP application. Throughout these conversations, Austin discussed the creation or use of approximately 114 business entities associated with PPP loan applications. A review of Austin's iCloud records showed that Austin communicated with approximately 212 people regarding PPP fraud.

     a.     A review of the iCloud records identified two Schedules C associated with Austin's business, Mechelle's Boutique, for the 2019 tax year. Austin provided one Schedule C to the IRS, listing $70,000 in total income for Mechelle's Boutique and $65,000 in net income. Austin provided to the SBA a second Schedule C listing $125,738 in total income for Mechelle's Boutique and $125,001 in net income.

     b.     A review of Austin's iCloud account identified 75 additional Schedules C for various businesses that were used to submit fraudulent PPP applications, 69 of which K.G. created and texted to Austin. These Schedules C each listed $115,360 in gross receipts and sales, $692 in operating expenses, $300 in home expenses, and $114,368 in total profit, with only the business and proprietor information changed.

c.      Austin solicited A.H. for help on January 11, 2021, asking, "Do you know how to do these ppp loans," while also sending A.H. a link to a PPP application site. A.H. replied that it was the same one she used and asked, "So what you tryna charge if they approved." Austin was unsure, stating, "I guess on how much they get back an we can split whatever." A.H. replied, "I'm tryna get em 20 and we can charge them 5." Austin agreed to a split, saying, "Ok bet 25 is cool with me," and continued, "Lmk[8] when you wanna start I got like 4 ppl already including my self." A.H. immediately replied by listing the PII that would be required to obtain the loan and stated, "We can start tonight." Austin informed A.H. she would immediately ask the interested parties for the requested PII.

d.      As soon as the partnership began, Austin attempted to help applicants who were not eligible under program rules apply for PPP loans. This began no later than January 11, 2021, when she asked A.H., "Will ppl with no business work? Or no." A.H. replied, "No, and you have to have a EIN. I forgot to add that on there." Austin followed up on January 13, 2021, asking, "Quick question. Can the person have a ein number but not a business?" A.H. responded, "Anyone can apply for a EIN and get one. The IRS doesn't verify if you have a actual business."

e.      A.H. also prepared a PPP application for Austin, which she finished on January 13, 2021.[9] A.H. provided a screenshot of the MBE Capital Partners PPP portal to Austin, showing the loan application had been submitted. A.H. would eventually send 55 screenshots of submission verifications for multiple individuals to Austin. Throughout

---

[8] According to my training and experience, "lmk" is an abbreviation for "let me know."
[9] Austin's initial submission of this loan application was rejected because it was incomplete, so she did not receive the loan proceeds until March.

**Affidavit of Special Agent Richard A. Miller**                                   **Page 20**

their conversations, A.H. and Austin ultimately discussed 61 individuals as potential PPP applicants, with Austin providing A.H. with the individuals' PII and supporting documents, such as birth certificates, social security cards, and driver's licenses.

      f.     Austin asked A.H. on January 13, 2021, "You know how to make LLCs. Got a few ppl who want one rq[10]." A.H. showed a willingness to assist, replying to Austin's question, "I never made a LLC but I have one myself so I'm sure it won't be hard."

      g.     Austin followed up on her initial questions to A.H. on January 20, 2021, asking, "Have ppl ever been denied or you don't know." A.H. quickly replied, "Yes they deny ppl. The SBA is being stricter this year because all the past fraudulent activity but ppl are still getting approved also."

      h.     As the applications progressed, Austin began to consider next steps. She reached out to A.H. on February 19, 2021, to ask about loan forgiveness, stating, "My dad got his money today but he wants to know about the forgiveness thing. He wants it to be forgiven in my head I'm like send my money." A.H. replied, "It depends on where the money came from, the bank who sent it should've sent him an email to set up an account. The forgiveness can't be applied for until at least 24 weeks after receiving the loan so he would have to wait anyways. The forgiveness part is wat to apply for, they usually don't ask you to send any additional information you just apply and the bank sends it to the SBA." A.H. followed up later the same day, saying, "When it's time to do the forgiveness for everyone I just need you to contact me and I'll try to assist them."

---

[10] According to my training and experience, "rq" is an abbreviation for "real quick."

**Affidavit of Special Agent Richard A. Miller**                              **Page 21**

i.      Apart from the PPP applications, Austin may have incorporated A.H. into additional COVID-related programs she was drawing from, telling A.H. on March 11, 2021, "I'm trying I was up all night doing them damn grants." A.H. then asked, "You doing grants still or was it PPP?" Austin then responded, "Grants I tryd one ppp I couldn't do so I said fuck it I only got 4 ppl left anyway I'll just let you do them." A.H. then asked, "Do you have to pay the grant back? If not can you apply for me." Austin immediately replied, "No & sure it's only for 9000 tho. An my friend bouta send you the other 500." A.H. continued, "Ok just let me know what I need to send you and what you'll charge me." Austin responded, "Just give me 500 & can you put those last 2 ppl in I sent you when you get a chance." A.H. subsequently provided her PII, including her business information. Later the same day, A.H. added, "Let me know if you need anything else. My husband wants to know can you do one for him? If so let me know how much so I can tell him and I'll send his." Austin agreed to help, and A.H. provided the PII for her husband.

j.      Austin also paid A.H. for creating false tax documents. A.H. informed Austin on January 6, 2021, "I finished the letter for you…just cash app me $20 for doing it and your email address. $Tayta578." Austin replied, "Did you make one or 2. I need one for taxes & ppp does it matter." A.H. then informed Austin, "For the ppp you'll need a copy of your schedule C and it'll need to be for more money." Austin asked if A.H. could make a Schedule C when necessary and received the response, "Yes I have one at my job computer I can use. I'll just need to edit it."

k.      As time progressed, Austin began to collect funds from applicants to bundle together before sending payment to A.H. Austin first acknowledged this practice on March

11, 2021, telling A.H., "Zelle. I'm using my own money cause she gotta give me cash." Austin later told A.H. on March 23, 2021, "After I gather all the money, I'm just going to wire transfer from my bank. So you can get it all at one time." A.H. replied, "Ok, verify with you bank first what's the most you can send. If it's less than what you need to you can apple pay or have them cash app it." When she had to, Austin structured her payments to A.H. to get around the apps' daily limits, telling A.H. on March 11, 2021, "She said she was gonna meet me at 3o'clock when she get off but I can go ahead and send you 1000 An then thousand at 12 then the 500."

l.    A.H. became frustrated at the end of the scheme, expressing her feelings to Austin that she was not getting enough of the proceeds of the scheme. A.H. told Austin on June 25, 2021, "I won't ever do this again, tryna help someone else and getting fucked ain't it for me." Austin replied, "I feel like you tryna say it like I got the money. I was honest wit you the whole time! I sent money to you every time money touched my hand! I texted ppl every day ran down on ppl I was running tryna make sure you got paid. They telling me what's up an I'm telling you if they lying about it that's they karma you will still be blessed always. &we made money it's nothing else I can really do."

42.    A review of Austin's iCloud account identified 16 CashApp accounts. One of those accounts, $bigmeech93, is associated with Austin, with the remaining 15 linked to other individuals. Austin sent a screenshot of her account via text to applicants to facilitate payment for her services. A.H. had a CashApp account, $Tayta578, that she sent to Austin to facilitate payments to A.H.

**Affidavit of Special Agent Richard A. Miller**                                        **Page 23**

43.     Austin maintained lists of PPP applicants on her iCloud account. A review of the records identified photos of typed lists with one of three enlarged bolded names at the top, names below it in smaller font, and associated notes, for example "paid" or "Complications." Three names appeared in the bolded font. Austin provided these photos to A.H. In addition to the typed lists, Austin texted A.H. photos of handwritten lists of individuals to document the progress of applications. The handwritten lists included a total of 43 individuals, while the typed lists recorded 44. Multiple individuals appeared on both the handwritten and typed lists, and some appeared more than once on the lists.

44.     On April 23, 2021, Austin shared with A.H. part of a text conversation that Austin had had with J.T. In this text conversation, J.T. asked Austin to be less conspicuous with her financial expenditures, stating, "My nigga I need you to listen to me and listen to me good, stop living flamboyant, we all caught up in this federal bullshit." After Austin expressed confusion, J.T. elaborated, "But it's an open investigation, they got everybody's name, the dates they were put in and the date money was pulled. I can't say but so much bc I wasn't supposed to say anything but that's not me. it's basically a waiting game. SBA ain't fuck us though, it's that PPP. I already know how they going come and they kiss my ass, what's 2 years fed? Nothing! But I'll gladly pay them back." When Austin questioned J.T.'s information, J.T. responded, "This coming from a federal lawyer meka not Roanoke hearsay. Not at liberty to say, as I said I supposed to say nothing about nothing just in case it stops the info. I'm waiting on more information." When Austin shared these messages with A.H., A.H. told Austin, "Just relax…all is well."

45.     A review of Austin's iCloud text messages also revealed:

a.      Austin was flexible in how she received payment for her services. When Austin initially suggested R.C. pay her via electronic banking, he responded, "I'll rather give y'all cash instead for I don't have to wait to touxh it." Austin responded, "Ok" and R.C. added, "Ima see if not I'll just cash app y'all." Austin again stated, "Ok."

b.      Austin also facilitated payments to others. Austin informed A.H. on March 23, 2021, "My friend is sending 5 for me lmk when you get it." On March 24, 2021, Austin directed J.S. to pay A.H. $7,500. J.S. subsequently texted Austin a receipt for a $7,500 deposit on March 31, 2021.

c.      Austin had issues collecting some of her payments. In a text exchange with a phone contact who the FBI believes to be K.H., the pair discussed issues with two women. With respect to the first, who remained unnamed, K.H. stated, "I'm like you gotta give meka her 5k from yours like it's no way you broke you just got yours they get high tigrhrt. Duh I'll fuck her up over my money that's fucked up I don't like ppl like that." K.H. then mentioned a second individual, "And mia did the same u got her 10k she lied and said her account froze." In an unrelated conversation with J.T., Austin mentioned "Davon" hadn't paid. To which J.T. replied, "Alvin said send him the pictures, he'll get it."

*Towanna Austin*

46.     Austin's mother, Towanna Austin, is known to have assisted Austin and/or participated with her in her criminal endeavors:

a.      A review of text messages stored in Austin's iCloud account as well as financial documents obtained through Grand Jury subpoenas revealed that Towanna assisted Austin with the PPP fraud scheme on a number of occasions, that Towanna held

bulk cash for Austin, and that Austin financed a vacation to Puerto Rico for Towanna using fraudulently obtained funds.

b.   For example, in a conversation on February 22, 2021, Austin complained that she was arguing with her dad, "Cause I just got him 20 thousand dollars an he ain't tryna pay me saying he gone send the money back an all this he a lame." Towanna responded, "You know he not sending it back money hungry the whole damn family he get it from him mama."

c.   In a conversation on April 19, 2021, Austin informed Towanna that "Ceebo gone bring you 5k". Towanna responded "Gm[11] an when gotta be at my job at 1130."

d.   In a conversation on April 20, 2021, Austin texted Towanna, "Ceebo said yo mama called back quick said aht aht[12] you 100 short. I said that's right ma." Towanna responded, "You took that other money." Austin confirmed, "Yeah I opened a business account an put it in the bank I didn't wanna just keep it laying around but I'm Not putting anymore in the bank I'm scared so ima just give it to you. I got like 40 thousand on me now."

e.   On April 19, 2021, Austin texted Towanna, "If anyone gets there money today ima have them bring it to you. Shanique gone bring you 5k I gave her your number my plane bouta take off I'll call you when I get there! I love you!!" Towanna responded, "K love you more be safe."

---

[11] According to my training and experience, "Gm" is an abbreviation for "Good Morning."
[12] According to my training and experience, "aht aht" is used in the manner of tsk tsk, and meaning "No."

f.      On May 10, 2021, Austin texted Towanna, "Ok I need 3 thousand I gotta re up can you count out 3 for me." Towanna responded, "Me count rite now. I'ma c." Approximately three minutes later, Towanna responded, "Done."

g.      On May 25, 2021, a few days after the conclusion of Austin's stay at the Fairmont El San Juan Hotel, Towanna texted Austin, "Just wanna say thanks gurl trip was the bomb I had the most awesomeness time ever I'm tired now and out love you." Austin responded, "You welcome. I love you more glad you enjoyed you self I'm tired asf[13]."

h.      A review of Austin's text messages from her iCloud revealed a conversation with Towanna Austin dated March 25, 2021. During the conversation, Austin stated, "I think I got approved for the house." Towanna Austin responded with a prayer emoji.

*Austin's Drug Dealing*

47.      Based on the FBI's review of Austin's communications, bank records, and other financial transactions, I am unaware of Austin having any legitimate source of income. Her claimed source of income is from selling women's clothing, but her financial transactions and documentation submitted with her loan applications are not consistent with this activity. As far as I can tell, Austin's income over the last few years has come exclusively from fraudulent activity (including the PPP fraud outlined above) and from dealing marijuana.

48.      On May 9, 2023, the FBI executed a search warrant of 1717 Jersey Avenue, Roanoke, Virginia. Jaimeka Austin and her children were at the residence. In plain view, agents

---

[13] According to my training and experience, "asf" is an abbreviation for "as fuck."

**Affidavit of Special Agent Richard A. Miller**                    **Page 27**

observed and seized approximately four pounds of green, leafy substance consistent with marijuana. During her interview, Austin denied any fraudulent activity but did admit to selling marijuana.

49.     The FBI conducted a financial analysis on Jaimeka Austin, which included reviewing records from her CashApp account and her boyfriend's, CashApp account. There were many deposits and transfers between their accounts, which are consistent with payments for drugs. For example, some of the transactions had subject lines such as: "weed," "for the half," "gas for ray," "for the juice," "sauce," and "load drop off." The amounts associated with these transactions are in amounts consistent with street level drug dealing.

*6428 Ellimar Field Lane*

50.     Much of Austin's financial activity is consistent with money laundering activity. To date, the FBI has found that she has at least one Apple Cash account, multiple accounts at Wells Fargo, and multiple Cash App accounts, and she routinely moves money among these accounts. She has instructed fraudulent loan applicants to deposit money into her various accounts, as well as accounts of those close to her, for her benefit. Austin's purchase of 6428 Ellimar Field Lane, Charlotte, North Carolina, 28215, is consistent with her money laundering activity.

51.     As referenced above, Austin's first PPP loan in the amount of $26,195 was deposited into her Wells Fargo account on or about March 23, 2021. Prior to her receipt of this loan money Austin had a total $768.93 between her two Wells Fargo bank accounts. When Austin had money in these accounts, she would frequently move money back and forth between them.

52.     Effective April 6, 2021, Austin entered into an exclusive buyer agreement with Engel & Volkers Uptown Charlotte ("Engel & Volkers") with respect to purchasing residential

**Affidavit of Special Agent Richard A. Miller**                              **Page 28**

property. It does not appear that Austin signed this agreement until on or about September 9, 2021, although the term of the agreement was set to last from April 6, 2021, through October 30, 2021. A.B. (Austin's real estate agent) signed this agreement on behalf of Engel & Volkers.

53.     Her second loan in the amount of $26,195 was deposited into the same account on May 24, 2021. Prior to her receipt of this loan money Austin had $20,566.85 (combined) in both of her Wells Fargo bank accounts.

54.     Three days after the money from the second loan hit Austin's bank account, on May 27, 2021, Austin got a pre-approval letter from New American Funding for a mortgage to purchase a $340,000 home. That same day, Austin signed a home purchase agreement by which she agreed to purchase 6428 Ellimar Field Lane, a new construction single-family home, at a sales price of approximately $338,140.

55.     On or about May 27, 2021, Austin used one of her Wells Fargo accounts to make an earnest deposit of $4,000 in order to secure her purchase of 6428 Ellimar Field Lane.

56.     On or about June 1, 2021, Austin went under contract to purchase 6428 Ellimar Field Lane.

57.     On or about June 22, 2021, Austin texted her co-conspirator K.G. that she needed "a huge favor." She then sent K.G. a PDF attachment entitled "AUSTIN GIFT LETTER.pdf." This document stated that a donor had made a $20,000 gift to Austin to be applied to the purchase of the property located at 6428 Ellimar Field Lane.

58.     The text message exchange continued as follows:

- K.G.: *Yes it's just a headache at this point.   But the letter.. you need me to fill it out & sign it as myself* (eyes emoji)

- Austin: *Yea an ima give you 20 thousand to put in yo bank not all at once a lil bit at a time cause I don't sign until October but ion trust anybody else* (smile emoji)

- K.G.: *Ok ok.  I got you*

- K.G.: *I'm so happy you got your house!*

- Austin: Loved " I'm so happy you got your house!"

- Austin: Loved "Ok ok. I got you"

59.    This house was subsequently identified in the text message exchange as 6428 Ellimar Field Lane, Charlotte, North Carolina, 28215.

60.     Austin and her real estate agent, A.B., exchanged text messages about the house throughout the process including the following exchange beginning on or about September 2, 2021.

- Austin: *If I didn't want to get the house would I be able to get the money I already put down?  Something has came up I can't put up that much money cause I'm being watched I wanna talk to you about it but it can't be over the phone it would have to be in person.*

- A.B.: *Are you in NC? You'll loose the money*

- Austin: *I'm in Roanoke.  How long could I push it off*

- A.B.: *Normally 8 days but with a builder I'll go back and read their guidelines.*

- Austin: *Ok lmk*

- A.B.: *Tomorrow at the house*

- Austin: *I don't know if I'll be up there tomorrow I'll let you know by the end of the day*

**Affidavit of Special Agent Richard A. Miller**                    **Page 30**

- Austin: *I really like you so I'll tel you what's going on I'm basically under investigation. The feds are being nosey in my business watching my every move they are going around asking ppl how do I make my money an what I'm doing with it they was sent down here to watch me because the keep hearing ppl talking about me & how good I'm doing! The I posted on Facebook I was moving to a new house to Charlotte (which I wish I wouldn't have done) cause it's making them watch me more.  Even looking in my bank at my ppp loan it's sick!  My lawyer told me don't spend any large amounts of money because they are watching me.  I'm tryna see if I could give the money to someone to gift it to me because I don't want the money to come out of my account it's been wrecking my brain for 3 days! & I'm really upset because I have been threw a lot I never thought I make it out of here & just when I was about to leave here come the bs again.  I've been in trouble a lot in my pass so to see me doing good as I am is mind blowing for this whole city but even if I have to rent a place I have to get away from here because it's a trap nobody wants to see you doing good around her! I don't want to put all that money into that house and lose everything I really don't know what to do! What do you think?? & you can send a audio message back you don't have to text.*

- A.B.: *Roanoke is very small.  And very few blacks with anything above poverty line living.  That's all to be expected.  You're working, an entrepreneur, and was entitled to PPP.  If your company is hone based you can claim a portion of it for your business.*

- A.B.: *Anyone that gift's you money would have to show where it came from.*
- Austin: *OK*

61.   The conversation continued on or about September 4, 2021:

- Austin: *I'm glad I know ppl who know things.   But all  so the girl I was Gifting I do a lot of business with her when they pulled by bank statements and they see I send her money often they went and talked to her asking why I send her money an stuff it's sicken I gotta get outta here asap*

- Austin: *Do you think my receipt will be enough for the irs? Or they gonna want proof proof*

- Austin: *GM by the way*

- A.B.: *Hello! Keep all your receipts and noted as it related to your business plans. Your accountant knows how to explain and implement write offs.   Let me know if you need a referral.*

- A.B.: Sends a gif

- Austin: Loves the gif

- Austin: *Is there anyway I can put my mom on there in case anything does happen to me she still pay my mortgage & air bnb out if need be?*

- Austin: *What kind of referrals*

- Austin: *Hey love how are you today*

- A.B.: *Girl I'm so sorry I was traveling…By Referrals I mean a good CPA… yes, you can add her to the deed.  If they won't do it at closing you can quick claim her immediately after.  I'm well today.   That you for asking.  Hou are YOU!!!!!?????*

**Affidavit of Special Agent Richard A. Miller**                           **Page 32**

- Austin: *I'm better just tryna wrap my head around all this lol you think I should just get every one to gift me an I just give them cash?*

- A.B.: *You can receive a gift from someone who has a vested interest in you*

- A.B.: *They have to show where the money came from. It must be seasoned.*

- Austin: *Ok ima gonna figure it out I'm gonna get this house*

- A.B.: *Has anyone questioned you directly*

- Austin: *No just other ppl*

- A.B.: *Weird. That's not typical.*

- Austin: *I think I'll be ok I'm just tryna be carful I don't wanna lose everything cause this is about to be a lot of money I gotta spend*

62.     The conversation continued on or about September 12, 2021:

- Austin: *I'm having a little hick up. The girl that was gifting me money is not responding now so I have 20k in cash that I need someone to gift me* (unidentified emojis)

- A.B.: *She has your money and not responding?*

- Austin: *I didn't give her the money yet I was waiting until sooner but it came sooner then I thought then with all the other bs going I'm just all over the place it's going to hurt my heart if this doesn't fall threw*

63.     The conversation continued on or about October 2, 2021:

- A.B.: *You'll probably have to go into the bank. I'm not sure about her just adding money to her account (*unidentified emoji*) However try texting Troy*

**Affidavit of Special Agent Richard A. Miller**                    **Page 33**

> *specific questions for instructions. I do know the large deposits were still in*
> *question because he emailed that yesterday.*

- Austin*: She would have to add like 20k I'm thinking.  but he said everything*
  *was good after he changed it to her giving me 70 like her account was a go so*
  *do you think they would see what she added*

- A.B.*: I can't say*

64. To purchase the 6428 Ellimar Field Lane property, Austin made the $4,000 deposit on May 27, 2021, secured a loan from New American Funding for approximately $274,867, paid approximately $7,500 at closing in closing costs, and received $70,000 from a purported gift. Documentation in the loan file relating to the $70,000 purported gift included a statement from Jaimeka Austin saying that N.D. (who Austin refers to as her "donor") is Austin's godmother and that they get together for family and social events. There are also several pictures of social events and a copy of N.D.'s business Wells Fargo Bank statement showing an August 31, 2021, ending balance of $100,001.87. There is also a Gift Letter signed by N.D. stating that she is giving Jaimeka Austin a $70,000 gift toward the purchase of 6428 Ellimar Field Lane and that the source of the funds is a Wells Fargo Bank account. There are numerous places on the letter that appear to be whited out, including the seven in $70,000. N.D sent two separate wires for the closing on or about October 4, 2021: one for $25,000 from her business Wells Fargo account and a second for $45,000 from a Wells Fargo account.[14]

65. Based on the above messages with K.G. and A.B., there is probable cause to believe that the $70,000 wired by N.D. originated with Austin. That is, there is probable cause to believe

---

[14] The particular account is not clear at this point. This wire may have come from the same account.

**Affidavit of Special Agent Richard A. Miller**                         **Page 34**

Austin provided this $70,000 to N.D. using the funds that Austin, as discussed above, illegally obtained from her fraud and drug sales and that Austin did so in order to disguise the source of this money.

66.     On or about October 6, 2021, Austin closed on the property of 6428 Ellimar Field Lane. Engel & Volker received a buyer's commission of approximately $10,144 as a part of this transaction. My understanding is that some of this commission went to A.B.

67.     On May 26, 2022, Jaimeka Austin filed a quitclaim deed with Mecklenburg County, North Carolina, granting 6428 Ellimar Field Lane to herself and Towanna Austin as joint tenants with rights of survivorship.

68.     The FBI has records for Austin's mortgage loan from October 2021 through May 2022. During this time, she made a total of $12,515 in payments towards her mortgage payment, insurance, and escrow for taxes, which includes several reversals of payments due to insufficient funds. Approximately $9,442 of these payments came from one of Austin's Wells Fargo accounts.

69.     Because Austin has no legitimate source of income, all of the money that she paid to purchase 6428 Ellimar Field Lane and all of her mortgage payments were paid for by her fraudulent activity and her marijuana sales.

70.     On or about April 28, 2023, 6428 Ellimar Field Lane was listed for sale. On or about April 30, 2023, the property went under contract for $398,000. A.B. was the listing agent. The transaction closed on May 22, 2023. Austin and her mother, Towanna Austin, were both listed

as sellers in the purchase contract.[15]  As a result, Austin and her mother, Towanna Austin, were set to receive the proceeds from the sale.[16]

71.      On May 17, 2023, U.S. District Judge Robert S. Ballou signed a Warrant to Seize Property Subject to Forfeiture, which I served on Richard McIntyre and Associates, PLLC, on May 22, 2023, after the closing of the sale of 6428 Ellimar Field Lane.  On May 23, 2023, the FBI in Charlotte received two checks from Richard McIntyre and Associates, PLLC, payable to the "U.S. Marshalls [sic] Service": check number 42542 dated May 23, 2023, in the amount of $47,376.26 for Jaimeka Austin's share of the proceeds and check number 45543 dated May 23, 2023, in the amount of $47,376.26 for Towanna Austin's share of the proceeds. On June 1, 2023, I forwarded these checks to the United States Attorney's Office in Roanoke where they were processed in accordance with their procedures for criminal and civil forfeiture seizures.

## **CONCLUSION**

72.      Based on the information contained in this affidavit and my investigation to date, there is probable cause to believe, and I do believe, that the SALE PROCEEDS as described above are involved in or are traceable to property involved in money laundering offenses in violation of 18 U.S.C. § 1957 and are property, real or personal, which constitutes or is derived from proceeds traceable to the gross receipts obtained, directly or indirectly, from violations of 18 U.S.C. § 1343 and 21 U.S.C. § 841(a)(1). The funds described above are therefore forfeitable pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C) and 21 U.S.C. § 881(a)(6).

---

[15] As discussed above, Towanna Austin did not contribute any funds to the down payment or mortgage payments for the house but was simply added to the deed by Austin in an attempt to insulate the property from seizure or forfeiture.

[16] The seller (Austin) did not agree to pay any of the buyer's closing expenses.

**Affidavit of Special Agent Richard A. Miller**                                    **Page 36**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 22nd day of April 2024.

_____
Richard A. Miller
Special Agent
Federal Bureau of Investigation

**Affidavit of Special Agent Richard A. Miller**                                    **Page 37**